IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

MELANIE NIXON, individually and as
parent and next friend of the minor child,
A.N.,

      Plaintiff,

v.                                                    No. 12-1125

HARDIN COUNTY BOARD OF EDUCATION,
*et al.*,

      Defendants.

_____

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
_____

## *INTRODUCTION*

The Plaintiff, Melanie Nixon, individually and as parent and next friend of the minor child, A.N., brought this action on May 30, 2012 against the Defendants, the Hardin County, Tennessee Board of Education; John Thomas, Director of Schools; Stephen Haffly, Principal of Hardin County Middle School ("HCMS"); and Stacey Stricklin, Assistant Principal of HCMS, alleging, pursuant to 42 U.S.C. § 1983, violation of rights under the First, Eighth and Fourteenth Amendments. Plaintiff also asserts various state law claims.  On September 30, 2013, the Defendants moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  (D.E. 25.)  An amended motion was filed on November 4, 2013.  (D.E. 35.)  The dispositive motion, as amended, is before the Court for disposition.

## *STANDARD OF REVIEW*

Rule 56 provides in pertinent part that "[t]he court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "To survive summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  Pucci v. Nineteenth Dist. Ct., 628 F.3d 752, 759-60 (6th Cir. 2010) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)) (internal quotation marks omitted).  "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party."  Id. at 759 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 748 (6th Cir. 2012) (quoting Anderson, 477 U.S. at 255, 106 S. Ct. 2505).  "Entry of summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  In re Morris, 260 F.3d 654, 665 (6th Cir. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)) (internal quotation marks omitted).

*LOCAL RULE VIOLATIONS*

Prior to addressing the merits of the instant motion, the Court deems it necessary to address the Plaintiff's noncompliance with the Local Rules of this district concerning motions for summary judgment.  The Local Rules require that "[m]emoranda in opposition to motions for summary judgment shall not exceed 20 pages without prior Court approval."  LR 56.1(b).  Plaintiff's response runs thirty-five pages despite the fact that a search of the docket reveals no request to exceed the Local Rule's page limitation.  The same Local Rule further mandates that

[a]ny party opposing the motion for summary judgment must respond to each fact set forth by the movant by either:

> (1)   agreeing that the fact is undisputed;
>
> (2)   agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or
>
> (3)   demonstrating that the fact is disputed.

Each disputed fact must be supported by specific citation to the record.  Such response shall be filed with any memorandum in response to the motion. *The response must be made on the document provided by the movant or on another document in which the non-movant has reproduced the facts and citations verbatim as set forth by the movant.  In either case, the non-movant must make a response to each fact set forth by the movant immediately below each fact set forth by the movant.*

Id. (emphasis added).  In responding to the motion for summary judgment, the Plaintiff merely set forth numbered responses to the Defendants' statement of facts, without reproducing those facts prior to presenting her responses.  Thus, Plaintiff has not complied with LR 56.1(b) on two bases.

Counsel is admonished that this Court takes a dim view of Local Rule violations.  In light of this matter's proximity to trial, the Court will not strike the Plaintiff's memorandum from the record for exceeding the page limit without prior consent of the Court or deem the movants' facts admitted.  This Court has taken both actions in the past and will not hesitate to do so again in the event Plaintiff's counsel strays from the Local Rules' requirements in the future.

*FACTS*

The material facts in this case are as follows.  A.N. entered HCMS after the sixth grade. (D.E. 26-1 (Dep. of A.G. Nixon) at 8.)  According to her deposition, she had known K.N. since the two were in preschool together.  (Id.)  They were reunited at HCMS.  (Id. at 10.)  After A.N. began attending the middle school, she testified that she and K.N. "argued back and forth," that they talked

about one another to friends, and that K.N. made fun of her.  (Id. at 10-33.)  A.N. recalled that the two girls liked the same boy and that K.N. tried to break her and the boy up.  (Id. at 12-13.)

Following an incident in which K.N. called A.N.'s friend Lauren Smith from Smith's boyfriend's phone to tell her K.N. was with him, Smith, who was upset by the call, "tweeted"[1] that she was going to "shoot [Nix] in the face," with an image of a girl's face, a gun and hashtags[2] "nolie" and "hopeshereadsthis."  (Id. at 34.)  A.N. tweeted back stating that she would help Smith and "Look, just to the poem...It works everything,"[3] followed by hashtag "isweear" and various smiley faces.  (Id. at 35.)  A.N. explained in her deposition that she didn't mean anything by the tweet and was joking.  (Id. at 39.)  When asked if there was anything in the tweet that would indicate she was joking, A.N. pointed to the "monkey faces" she added to the end, but she admitted that someone reading it might interpret it as not being a joke.  (Id. at 39-40.)  In a subsequent tweet to Smith, A.N. stated "Good Luck.  Shoot her in the face," followed by pictures of a face and a gun.  (Id. at 41-42.)  As was the case with the preceding tweet, A.N. acknowledged in her deposition that an outsider reading the tweet would not have known whether she was joking.  (Id. at 42.)  These tweets occurred immediately following the phone conversation between Smith and K.N.  (Id. at 41.)

In another tweet conversation with Carli Hunt, a friend of both K.N. and A.N., A.N. stated

---

[1]"Twitter is an online social media site whereby its users 'tweet' their thoughts."  Roasio v. Clark Cnty. Sch. Dist., No. 2:13-CV-362 JCM (PAL), 2013 WL 3679375, at *5 (D. Nev. July 3, 2013).  "A 'tweet' is a message by a user of Twitter.  A user of Twitter has 'followers,' which are other users of the Twitter social media site, [who] may read an individual's thoughts or 'tweets.'"  Id.

[2]"Users of Twitter commonly place hashtags, signified by a number sign (#), in front of words to signify the topic, genre or style of the tweet; users can then search for or sort tweets by hashtag."  In re Grand Jury Subpoena No. 11116275, 846 F. Supp. 2d 1, 3-4 n.5 (D.D.C. 2012).

[3]The "poem" apparently refers to a poem Smith wrote about K.N. talking to or trying to steal Smith's boyfriend.  (D.E. 26-1 at 39.)

"I hate her.  That was my whole point.  Carli, goodness, I'm funny.  I'll kill her."  (Id. at 46.)  A.N. testified that she could not recall to whom she was referring but admitted it was "probably" K.N. (Id. at 46-47.)  Again, A.N. denied that she was serious about wanting to kill K.N. but conceded that an outsider would not know from the tweet that she did not intend to harm K.N.  (Id. at 47-48.)  The parties appear to agree that these tweets were made in mid-October 2011.  (D.E. 35-2 ¶ 4, 28-3 ¶ 4.) K.N.'s mother, a teacher, took the tweets seriously, stating in her deposition that

> I took it very serious, based on the history and all that had occurred, and been said, and transpired.  I was not sure.  Could I say yes, that I believe that they were going to kill her, I cannot say that.  Did I feel that they might harm her, yes.

(D.E. 26-9 (Dep. of Wendi Star Nix) at 34[4].)  She called Stricklin at home to advise him of her concerns about sending her daughter to school the next day.  (Id. at 29-30.)  He told her he would tell Haffly the next morning.  (Id. at 30-31.)

On October 21, 2011, Stacy Lynn Moore, an employee of the Hardin County Sheriff's Department and a school resource officer, was directed by Haffly that an incident had occurred involving threats and that if Moore, who usually got to the campus at 7:00 a.m., saw A.N. and Smith prior to Haffly's arrival, he was to escort them to the school office.  (D.E. 26-6 at 7, 11, 21-23.) Haffly read the tweets and passed the matter over to Stricklin to conduct interviews of the girls. (D.E. 26-7 (Dep. of Steven Haffly) at 40.)  Haffly testified that he gave Stricklin a copy of the tweets and instructed him that, if he determined the girls "did it," Haffly would recommend a forty-five-day suspension as punishment.  (Id. at 32.)  He explained that, during the forty-five-day period, Smith and A.N. would be reassigned to an alternative school.  (Id. at 36.)

---

[4]Page numbers citing to the record herein refer to the page at which the cited material appears on the Court's docket rather than to any page numbering on the document itself.

In addition to being assistant principal of HCMS, Stricklin had also served as an athletic director and a teacher.  (D.E. 26-12 (Dep. of Stacy Stricklin) at 15-16.)  During the course of his tenure in the Hardin County schools, Stricklin had received continuing education on various subjects, including one seminar on discipline.  (Id. at 25-28.)  When he met with A.N. in the office, she recalled that he yelled at her angrily, face red, and asked if she thought K.N. deserved the treatment she and Smith had made her endure.  (D.E. 26-1 at 56-58.)  She tearfully told him they were "just joking," that they "didn't mean anything by it" and that they "weren't going to hurt her."  (Id. at 58.)  A.N. testified that Stricklin asked if she had a weapon in her bag.  (Id.)  When she replied that she did not, he appeared to believe her.  (Id.)  According to A.N., the interview lasted approximately thirty minutes.  (Id. at 59.)

After it was over, A.N.'s mother, Ms. Nixon, was called and instructed to come to the school.  (Id. at 60.)  At that point, both were advised by Haffly that A.N. would serve forty-five days in alternative school.  (Id. at 60-61.)  In his deposition, Haffly explained that students such as A.N. could appeal his decision to the Hardin County Discipline Hearing Authority and then to the Board of Education.  (D.E. 26-7 at 36.)  On October 27, 2011, Nixon requested and was granted a disciplinary hearing for her daughter.  (D.E. 26-3 (Dep. of Melanie Rhodes[5]) at 56-57.)  Following the hearing, the disciplinary authority reduced the number of days A.N. was to attend the alternative school to ten and required her to participate in counseling.  (D.E. 26-5 at 1-2.)

The alternative school, described by Haffly in his deposition as an "alternative placement," (D.E. 26-7 at 24), is located approximately two miles from the site of the middle school.  (D.E. 26-2

---

[5]Melanie Nixon is also identified herein as Melanie Rhodes.

(Dep. of Chuck Patton[6]) at 27.)  Students assigned to the alternative school continue to perform work from the classes in which they were enrolled prior to the assignment and use the same textbooks. (D.E. 35-2 ¶ 26, D.E. 28-3 ¶ 26.)  A.N. alleged that, on her first day at the alternative school, a male student asked her to sit on his lap.  (D.E. 26-1 at 63-64.)  She reported the incident to her mother. (Id. at 64.)  While she did not tell anyone at the school about it, she thought her mother might have done so.  (Id.)  On her second day, when the students were told to play basketball, A.N. recalled that "boys kept on coming up behind [her and Smith] and messing with [them] and trying to get the ball and stuff."  (Id. at 56.)  "[T]he boys kept on," she stated in her deposition, "and [she] was feeling really uncomfortable, and . . . went and told [Patton] about it in the office they were in."  (Id.)  She remembered that Patton directed the boys to "quit" and "back off."  (Id.)  A.N. did not return to the alternative school.  (Id. at 68.)  Afterward, she related that she "stayed home for a while" and then began attending school in Corinth, Tennessee.  (Id. at 69.)

*ASSERTIONS OF THE PARTIES AND ANALYSIS*

Agreement of Parties that Certain Claims Should be Dismissed.

At the outset, the Court notes that the parties are in agreement that certain claims should be dismissed, including all allegations against Defendant Thomas and the official capacity claims as to Defendants Haffly and Stricklin.

Federal Claims.

*§ 1983 Claims Generally*

Title 42 U.S.C. § 1983 provides in pertinent part that

---

[6]Charles Lane Patton is director of the Hardin County Alternative School/Learning Center.  (D.E. 26-2 at 11.)

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

The statute "creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere." Flagg v. City of Detroit, 715 F.3d 165, 173 (6th Cir. 2013) (internal quotation marks omitted), reh'g & reh'g en banc denied (June 18, 2013). In order to succeed on a § 1983 claim, a plaintiff must show that the defendant "acted under color of state law" and that its "conduct deprived the plaintiff of rights secured under federal law." Handy-Clay v. City of Memphis, 695 F.3d 531, 539 (6th Cir. 2012). The parties' assertions focus on the second element of the § 1983 claim.

*Alleged Constitutional Violations*

First Amendment

"As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." United States v. Alvarez, ___ U.S. ___, 132 S. Ct. 2537, 2543, 183 L. Ed. 2d 574 (2012) (quoting Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002)). Plaintiff has alleged in this case that the tweets posted by A.N. on her Twitter account constituted protected speech under the First Amendment and, therefore, school officials had no authority to punish her.

The Defendants first argue in their dispositive motion that Tennessee law expressly authorizes school officials to suspend students for threats of violence against other students, citing Tennessee Code Annotated § 49-6-3401[7] and that Plaintiff's First Amendment claim is in essence

---

[7]The Tennessee statute authorizes a principal or assistant principal of a public school to "suspend a pupil from attendance at the school . . . for good and sufficient reasons." Tenn. Code

a constitutional challenge to the statute. Such a challenge, they assert, should be brought before the state attorney general, who has the duty to defend the constitutionality of legislation enacted by the general assembly, *see* Tenn. Code Ann. § 8-6-109, and, thus, requests this Court to decline jurisdiction.[8] Defendants do not contend that this Court lacks jurisdiction over this claim and have offered no caselaw supporting their request that the Court decline jurisdiction. As the Court is unconvinced at this stage that the relief sought by the movants is appropriate, it will continue its analysis of the First Amendment claim.

"First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506, 89 S. Ct. 733, 736, 21 L. Ed. 2d 731 (1969). It was well-established that teachers and students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Id., 89 S. Ct. at 736. However, "school officials retain some authority consistent with fundamental constitutional safeguards to prescribe and control conduct in the schools." Defoe *ex rel.* Defoe v. Spiva, 625 F.3d 324, 331 (6th Cir. 2010) (citing Tinker, 393 U.S. at 507, 89 S. Ct. 733) (internal quotation marks omitted), *cert. denied*, ___ U.S. ___, 132 S. Ct. 399, 181 L. Ed. 2d 255 (2011). "The constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings, and the Constitution does not compel school officials to surrender control of the American public school system to public school students." Id. (citing Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 682, 686, 106 S. Ct. 3159, 92 L. Ed. 2d 549 (1986))

---

Ann. § 49-6-3401(a). "Good and sufficient reasons for suspension include . . . [v]iolence or threatened violence against the person of any personnel attending or assigned to any public school." Tenn. Code Ann. § 49-6-3401(a)(3).

[8]A review of the complaint reveals nothing that could be construed, in the Court's view, as a challenge to the constitutionality of any state statute, including that cited to by the Defendants.

(internal quotation marks omitted).

In <u>Tinker</u>, the plaintiffs were part of a group that decided to wear black armbands to school to publicize their objections to the Vietnam war. <u>Tinker</u>, 393 U.S. at 504, 89 S. Ct. at 735. School officials became aware of the plan and adopted a policy that any student wearing an armband on campus must either remove it or face suspension. <u>Id.</u>, 89 S. Ct. at 735. The United States Supreme Court concluded, however, that the "wearing of armbands in the circumstances of this case was entirely divorced from actually or potentially disruptive conduct by those participating in it" and was "closely akin to 'pure speech' which . . . is entitled to comprehensive protection under the First Amendment." <u>Id.</u> at 505-06, 89 S. Ct. at 736. The Court noted that

> [t]he school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners. There is here no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone.

<u>Id.</u> at 508, 89 S. Ct. at 737. The Court explained that a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" was not sufficient to warrant a prohibition of speech. <u>Id.</u> at 509, 89 S. Ct. at 738. Rather, a student may express her opinions if she does so "without materially and substantially interfering with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others." <u>Id.</u> at 513, 89 S. Ct. at 740 (internal quotation marks omitted).

In subsequent cases, the Court made clear that school officials need not always justify regulation of student speech utilizing the <u>Tinker</u> framework. <u>Defoe</u>, 625 F.3d at 331. In <u>Fraser</u>, a student delivered a speech before a school assembly nominating a fellow student for a student government office. <u>Fraser</u>, 478 U.S. at 677, 106 S. Ct. at 3161. During the speech, the student "referred to his candidate in terms of an elaborate, graphic, and explicit sexual metaphor." <u>Id.</u> at

677-78, 106 S. Ct. at 3161.  Before the Supreme Court was the question of whether his suspension for violating a school rule prohibiting the "use of obscene, profane language or gestures" impermissibly infringed on his First Amendment rights.  Id. at 678, 106 S. Ct. at 3162.  The Court upheld the school's action, articulating that, as "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse," "[t]he schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct[.]"  Id. at 683, 106 S. Ct. at 3164.  The Court distinguished the political message of the armbands in Tinker from the sexual content of Fraser's speech and the "obvious concern [of school authorities] to protect children -- especially in a captive audience -- from exposure to sexually explicit, indecent, or lewd speech."  Id. at 684, 106 S. Ct. at 3165; see also Defoe, 625 F.3d at 331-32.  As the Supreme Court later explained, "[h]ad Fraser delivered the same speech in a public forum outside the school context, it would have been protected[; i]n school, however, Fraser's First Amendment rights were circumscribed in light of the special characteristics of the school environment."  Morse v. Frederick, 551 U.S. 393, 405, 127 S. Ct. 2618, 2626-27, 168 L. Ed. 2d 290 (2007) (internal citations & quotation marks omitted).

In Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S. Ct. 562, 98 L. Ed. 2d 592 (1988), staff members of a school newspaper sued school officials for violation of their First Amendment rights following deletion of articles from an issue of the paper dealing with student pregnancy and the impact of divorce.  Hazelwood, 484 U.S. at 260, 108 S. Ct. at 564.  Thus, Hazelwood, unlike Tinker, dealt with "educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school."  Id. at 270-71, 108 S. Ct.

at 569-70.  The Supreme Court concluded that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns."  Id. at 273, 108 S. Ct. at 571.

As the Sixth Circuit instructed in Barr v. Lafon, 538 F.3d 554 (6th Cir. 2008), *cert. denied*, 558 U.S. 817, 130 S. Ct. 63, 175 L. Ed. 2d 24 (2009),

> [t]he above trilogy of cases yields three principles:  (1) under Fraser, a school may categorically prohibit vulgar, lewd, indecent, or plainly offensive student speech; (2) under Hazelwood, a school has limited authority to censor school-sponsored student speech in a manner consistent with pedagogical concerns; and (3) the Tinker standard applies to all other student speech and allows regulation only when the school reasonably believes that the speech will substantially and materially interfere with schoolwork or discipline.

Barr, 538 F.3d at 563-64 (internal citations omitted); *see also* Defoe, 625 F.3d at 332 (citing Barr).

Generally speaking, the

> closer expression comes to school-sponsored speech, the less likely the First Amendment protects it . . . [a]nd the less the speech has to do with the curriculum and school-sponsored activities, the less likely any suppression will further a legitimate pedagogical concern, which is why the First Amendment permits suppression under those circumstances only if the speech causes substantial disruption of or material interference with school activities.

Ward v. Polite, 667 F.3d 727, 734 (6th Cir. 2012), *reh'g & reh'g en banc denied* (Apr. 19, 2012) (internal citation & quotation marks omitted).

In 2007, the United States Supreme Court issued its opinion in Morse, which involved the suspension of a student for unfurling a banner stating "BONG HiTS 4 JESUS" at a school-sanctioned and sponsored event.  Morse, 551 U.S. at 393, 127 S. Ct. at 2619-20.  The Court, recognizing that "schools may regulate some speech even though the government could not censor similar speech outside the school," opined there was no violation of the First Amendment, noting that

> [s]chool principals have a difficult job, and a vitally important one. When Frederick suddenly and unexpectedly unfurled his banner, Morse had to decide to act -- or not act -- on the spot. It was reasonable for her to conclude that the banner promoted illegal drug use -- in violation of established school policy -- and that failing to act would send a powerful message to the students in her charge, including Frederick, about how serious the school was about the dangers of illegal drug use. The First Amendment does not require schools to tolerate at school events student expression that contributes to those dangers.

Id. at 405-06, 409-10, 127 S. Ct. at 2627, 2629. This circuit has interpreted Morse narrowly, as "determining no more than that a public school may prohibit student expression at school or at school-sponsored events during school hours that can be reasonably viewed as promoting drug use." Defoe, 625 F.3d at 332-33 (internal quotation marks omitted).[9]

Neither the United States Supreme Court nor the Sixth Circuit Court of Appeals has considered the First Amendment issue raised in this case -- whether schools may regulate off-campus online speech by students -- in light of Tinker and its progeny. See Yoder v. Univ. of Louisville, 526 F. App'x 537, 545 (6th Cir. 2013) (noting that neither the Supreme Court nor the Sixth Circuit have ruled on the subject), cert. denied, 2013 WL 5505423, 82 U.S.L.W. 3244 (U.S. Dec. 9, 2013). In arguing their positions, the parties here rely on decisions from other circuits.

The Defendants cite to opinions from the Second, Fourth, Eighth and Ninth Circuits, which the Court will review seriatim. In Doninger v. Niehoff, 527 F.3d 41 (2d Cir. 2008), the Second Circuit was presented with the question of whether school officials violated a student's First Amendment rights by prohibiting her from running for senior class secretary in light of a weblog

---

[9]In doing so, the Defoe court pointed to Supreme Court Justice Samuel Alito's concurrence in Morse, in which he stated that he joined the majority opinion "on the understanding that . . . it goes no further than to hold that a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use . . .," and that it "does not hold that the special characteristics of the public schools necessarily justify speech restrictions beyond those recognized in Tinker, Fraser, and Hazelwood." Defoe, 625 F.3d at 333 n.5 (citing Morse, 551 U.S. at 422-23, 127 S. Ct. 2618 (Alito, J., concurring)) (internal alterations & quotation marks omitted).

or "blog"[10] entry posted from her home computer during non-school hours criticizing the school's decision regarding a planned campus event. <u>Doninger</u>, 527 F.3d at 43. In the blog, the plaintiff encouraged fellow students to protest the decision. <u>Id.</u> at 50. She testified that students were "all riled up" and that a sit-in was threatened. <u>Id.</u> at 51. The appellate court, citing <u>Tinker</u>, noted that "student expression may legitimately be regulated when school officials reasonably conclude that it will materially and substantially disrupt the work and discipline of the school." <u>Id.</u> at 52 (internal quotation marks omitted). The court found that, on the record before it, Doninger's expression was reasonably regulated, despite the fact that she made the posting from an off-campus location. <u>Id.</u> at 53.

In <u>Kowalski v. Berkeley County Schools</u>, 652 F.3d 565 (4th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1095, 181 L. Ed. 2d 1009 (2012), the plaintiff was suspended for creating and posting to a discussion group MySpace.com webpage[11] largely dedicated to ridiculing another student. <u>Kowalski</u>, 652 F.3d at 567. The page was titled "S.A.S.H.," which Kowalski claimed was an acronym for "Students Against Sluts Herpes," although a classmate, Ray Parsons, stated that it stood for "Students Against Shay's Herpes," referring to fellow student Shay N., who was the primary subject of the page. <u>Id.</u> at 567. After creating the page, Kowalski invited approximately 100 people to join the group. <u>Id.</u> Some two dozen students at her high school responded and ultimately joined. <u>Id.</u> Parsons responded to the invitation while on a school computer and was the first to join the group. <u>Id.</u> at 568. He uploaded photographs of Shay N. and posted comments

___

[10]A blog is "a [website] that contains an online personal journal with reflections, comments, and often hyperlinks provided by the writer[.]" <u>Silver v. Brown</u>, 382 F. App'x 723, 725 n.1 (10th Cir. 2010).

[11]MySpace "is a social networking website that allows its members to set up online 'profiles' and communicate via email, instant messages, and blogs." <u>Wynar v. Douglas Cnty. Sch. Dist.</u>, 728 F.3d 1062, 1065 (9th Cir. 2013).

indicating that she had herpes and referring to her as a "whore."  Id.  Other students commented on the pictures and added their own statements about the targeted student.  Id.

The next day, after becoming aware of the website, Shay N.'s parents, along with their daughter, went to the school and filed a harassment complaint with school officials.  Id.  The girl left the school with her parents after the meeting, uncomfortable with the thought of sitting in class alongside other students who had made disparaging remarks about her.  Id.  Kowalski was suspended.  Id.

She sued, claiming that, because her case involved off-campus, non-school related speech, school officials were powerless to discipline her.  Id. at 570-71.  The Fourth Circuit found that Tinker supported the conclusion that "public schools have a compelling interest in regulating speech that interferes with or disrupts the work and discipline of the school, including discipline for student harassment and bullying."  Id. at 572 (internal quotation marks omitted).  Kowalski's speech caused such an interference and disruption, the court held, even though she created the website and posted comments from home, because she knew its content would be published beyond her residence and could reasonably be expected to reach the school and impact the school environment.  Id. at 573.  She also knew the postings and comments would and did take place among students at the school for whom she created the site and whom she invited to join the group.  Id.  Kowalski was aware that the fallout from her conduct and the speech would be felt at the school and could have anticipated that Shay N. and her parents would have considered the attack to have been made in the school context and acted accordingly.  Id.  The court further noted that, had the school not intervened, the potential for additional and more serious harassment of Shay N. was real.  Id. at 574.  Thus, "[g]iven the targeted, defamatory nature of Kowalski's speech, aimed at a fellow classmate, it created 'actual

or nascent' substantial disorder and disruption in the school."[12]  Id.

The plaintiffs in S.J.W. *ex rel.* Wilson v. Lee's Summit R-7 School District, 696 F.3d 771 (8th Cir. 2012), *reh'g & reh'g en banc denied* (Nov. 21, 2012) were twin brothers suspended from school after creating a website and blog the purpose of which was to discuss, satirize and "vent" about events at their high school.  Lee's Summit, 696 F.3d at 773.  One of the boys used a school computer to upload files needed to create the site.  Id. at 774.  Immediately thereafter, the siblings posted offensive and racist comments, as well as sexually explicit and degrading statements about certain female classmates, who they identified by name.  Id. at 773.  The racist posts described fights at the school and mocked black students.  Id.  Although the plaintiffs initially told only a few school friends about the website, soon everyone knew.  Id. at 774.  Numerous school computers were used to access or attempt to access the site.  Id.

Citing Doninger and Kowalski, the Eighth Circuit applied Tinker in finding that the plaintiffs' posts were directed at the school and, therefore, could reasonably be expected to reach the school or impact its environment.  Id. at 777-78.  The off-campus nature of the speech was less important, in the court's view, than the fact that it targeted the educational institution itself.  Id. at 778.

The Ninth Circuit decided Wynar v. Douglas County School District, 728 F.3d 1062 (9th Cir. 2013) in August 2013.  In that case, a high school student began sending a string of increasingly violent and threatening instant messages from home via MySpace to his friends bragging about weapons he possessed and threatening to shoot persons at the school on a specific date.  Wynar, 728 F.3d at 1064-65.  His friends became alarmed and confided their concerns to a trusted coach.  Id.

---

[12]The Fourth Circuit observed that, if the speech had occurred in school, Fraser may have also applied.  Kowalski, 652 F.3d at 573.

at 1066.  The principal was alerted and the student was suspended.  Id.  The Ninth Circuit, while questioning whether it applied to all off-campus speech, analyzed the facts before it under Tinker and concluded that the threat of a school shooting certainly qualified as speech that might reasonably lead officials to forecast substantial disruption of or material interference with school activities or collision with the rights of other students to be secure.  Id. at 1071.

In contrast, the Plaintiff draws the Court's attention to a case from the Third Circuit -- Layshock v. Hermitage School District, 593 F.3d 249 (3d Cir. 2010) -- in support of her opposition to summary judgment.  The Court notes that the opinion cited by the Plaintiff was vacated upon the Third Circuit's grant of rehearing en banc.  After rehearing, the court issued its en banc opinion at 650 F.3d 205 (3d Cir. 2011).

In Layshock, the plaintiff used his grandmother's home computer to access a social networking website where he created a fake, and unflattering, internet MySpace profile of his high school principal.  Layshock, 650 F.3d at 207-08.  In doing so, he copied a photograph of the principal from the school's website.  Id.  Layshock afforded access to the profile to other students and it was not long before everyone at the school, including the principal, knew about it.  Id. at 208.  Over the following days, students, including Layshock, accessed the profile using school computers.  Id. at 209.  The plaintiff was suspended and sent to an alternative school.  Id. at 210.  The student brought a § 1983 action against the school district arguing violation of the First Amendment.  Id.

In seeking to justify its actions, the school district invoked Tinker and/or Fraser.  Layshock v. Hermitage Sch. Dist., 496 F. Supp. 2d 587, 599 (W.D. Pa. 2007).  The trial court determined that Fraser had no application because the plaintiff's activities occurred off campus.  Id. at 599-600.  With respect to Tinker, the lower court concluded that the defendant could not establish "a sufficient nexus between [Layshock's] speech and a substantial disruption of the school environment,"

17

observing that no classes were cancelled, no widespread disruption occurred, and there was no violence or student disciplinary action. Id. at 600. While students commented on the profile, the court noted that "in Tinker the Supreme Court held that the far more boisterous and hostile environment sparked by the children wearing anti-Vietnam war armbands did not give school officials a reasonable fear of disturbance sufficient to overcome their right to freedom of expression." Id. (internal citation omitted). The Third Circuit affirmed. Layshock, 650 F.3d at 219.

The Plaintiff also cites to Beussink ex rel. Beussink v. Woodland R-IV School District, 30 F. Supp. 2d 1175 (E.D. Mo. 1998), in which the plaintiff created and posted an internet homepage from his home computer that criticized his high school and its administration in crude and vulgar terms. Beussink, 30 F. Supp. 2d at 1177. A friend of Beussink accessed the page during a class a few days later and showed it to a teacher, Ms. Ferrell, who became upset and immediately informed the principal. Id. at 1178. The principal also found the post upsetting, and decided to discipline the plaintiff immediately upon viewing it. Id. Groups of Beussink's classmates saw the page, but some viewed it with Ferrell's permission. Id. at 1179. The plaintiff was suspended for ten days. Id. The court concluded that his First Amendment claim had merit, in light of evidence that the principal's actions were based not on a fear of disruption or interference with school discipline, but because he disliked and was upset by the content of Beussink's speech, which was not an acceptable justification for limiting student expression under Tinker. Id. at 1180.

The Defendants argue that the cases cited in their brief support summary judgment here. Specifically, they point out that, like Doninger, A.N. made negative comments about another student on the internet; that, like Kowalski and the plaintiffs in Lee's Summit, she used a social media platform to make negative and offensive comments about a classmate; and that, like Wynar, she sent out messages over the internet threatening to shoot persons with whom she attended school. Even

18

so, however, material circumstances present in those cases do not exist here.  In Doninger, Kowalski and Wynar, the facts reflected, and the courts found, that the students' actions could or did substantially disrupt activities of their schools.  In Lee's Summit, the school itself was the target of the students' speech and, thus, the court concluded that it was to be reasonably expected that the speech would reach the school or impact its environment.

Here, the speech had no connection to HCMS whatever other than the fact that both the speaker and the target of the speech studied there.  The speech was not made at school, directed at the school, or involved the use of school time or equipment.  No disruption of school activities or impact on the school environment has been shown.  Thus, it is the finding of the Court that the Defendants have fallen short of establishing that summary judgment should be granted in their favor.[13]

The movants also submit that this case is analogous to Morse in that the speech contained in the tweets, which officials concluded promoted an illegal act (murder), had to be acted on immediately, particularly in light of the incidents at Columbine, Newtown and Virginia Tech.  While this argument is perhaps somewhat more persuasive than the preceding one, at least on a visceral level, the Court notes that Defendants have cited to no caselaw, other than Morse, in favor of their assertion.  In light of that failure, coupled with this Circuit's narrow reading of Morse, the Court is unwilling to grant summary judgment on such grounds.[14]

For the reasons articulated herein, the motion for summary judgment on the First

---

[13]Based on the Court's conclusion that summary judgment is not warranted based on the Defendants' cited caselaw, it need not, and does not, specifically adopt Layshock.

[14]The Court observes that the Morse Court placed much emphasis on the fact that the speech at issue occurred at school or at a school-sponsored event.  As mentioned previously herein, there was no connection between the speech and the school beyond the common attendance of the persons immediately involved.

Amendment claim is DENIED.

<u>Fourteenth Amendment</u>

Plaintiff alleges that the Defendants' failure to conduct an investigation, interview the pertinent parties, provide a hearing before levying punishment and subjecting A.N. to outrageous sexual assault and harassment at the alternative school violated the Fourteenth Amendment Due Process Clause. She also avers that Defendants' actions offended her Fourteenth Amendment right to direct her child's education.

The analysis of a student's procedural due process rights in a school suspension case begins with <u>Goss v. Lopez</u>, 419 U.S. 565, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975), in which the United States Supreme Court found that students faced with suspensions lasting longer than ten days possess a property interest in an education and a liberty interest in their reputations that entitle them to protection against arbitrary suspension under the Due Process Clause. <u>Goss</u>, 419 U.S. at 576, 95 S. Ct. at 737; *see* <u>Heyne v. Metro. Nashville Publ. Schs.</u>, 655 F.3d 556, 564 (6th Cir. 2011) ("The starting point for analyzing alleged violations of students' procedural due process rights in school suspension cases is <u>Goss v. Lopez</u>[.]"). For suspensions lasting no more than ten days, the Constitution requires that "the student be given oral or written notice of the charges against [her] and, if [she] denies them, an explanation of the evidence the authorities have and an opportunity to present [her] side of the story." <u>Goss</u>, 419 U.S. at 581, 95 S. Ct. at 740. Due process "requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school." <u>Id.</u>, 95 S. Ct. at 740.

The Clause "does not require that hearings in connection with suspensions of ten days or fewer follow trial-type procedures." <u>Heyne</u>, 655 F.3d at 565 (citing <u>Goss</u>, 419 U.S. at 583, 95 S. Ct. 729). Nor does it "give students the right to be represented by counsel, to confront and cross-

examine witnesses against them, or to call their own witnesses." Id. (citing Goss, 419 U.S. at 583, 95 S. Ct. 729).  Rather, it requires only minimal procedures.  Id.  As the Goss Court explained:

> There need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred.  We hold only that, in being given an opportunity to explain [her] version of the facts at this discussion, the student first be told what [she] is accused of doing and what the basis of the accusation is.

Goss, 419 U.S. at 582, 95 S. Ct. at 740.[15]  As a general rule, notice and hearing should precede removal of the student from the school.  Id., 95 S. Ct. at 740.  An "informal give-and-take between student and disciplinarian" is sufficient to satisfy due process.  Id. at 584, 95 S. Ct. at 741; Heyne, 655 F.3d at 565.  The Sixth Circuit requires no more process than that identified in Goss.  Heyne, 655 F.3d at 565.  This circuit has suggested that assignment to an alternative school may not implicate the Due Process Clause at all, "absent some showing that the education received at the alternative school is significantly different from or inferior to that received at [the student's] regular public school."  Buchanan v. City of Bolivar, 99 F.3d 1352, 1359 (6th Cir. 1996).

Even assuming the Clause applies here, summary judgment on A.N.'s claim is appropriate. She testified in her deposition that Stricklin told her she was in trouble because of the tweets about K.N.  (D.E. 26-1 at 56.)  She did not deny authoring the tweets.  The following testimony was adduced in her deposition:

> Q:    Okay.  And at any point during your meeting with Mr. Stricklin, did you make any comments?
>
> A:    I don't remember saying much at all.  Like I said, I was crying.  I couldn't say anything.  He didn't ask me any questions for me to answer.

---

[15]The Sixth Circuit has noted that "[w]hile Goss specifically limited itself to the short suspension, not exceeding ten days, it nevertheless establishes the *minimum* requirements for long-term expulsions as well."  Newsome v. Batavia Local Sch. Dist., 842 F.2d 920, 927 (6th Cir. 1988) (internal citation & quotation marks omitted).

Q:      Okay.

A:      I did tell him -- he asked me if she deserved this, and I said no.  I told him we
        were just joking, we didn't mean anything by it, we weren't going to hurt her.
        And he asked me if I had a weapon in my bag, and I said no.

(D.E. 26-1 at 58.)  Thus, by A.N.'s own admission, Stricklin asked her to defend her behavior and

gave her an opportunity to respond, which she did.  She was entitled to no more process than that.

*See* Buchanan, 99 F.3d at 1359 ("[O]nce school administrators tell a student what they heard or saw,

ask why they heard or saw it, and allow a brief response, a student has received all the process that

the Fourteenth Amendment demands.").

Melanie Nixon alleges a separate Fourteenth Amendment claim on her own behalf.  The Due

Process Clause "includes a substantive component that provides heightened protection against

government interference with certain fundamental rights and liberty interests." Troxel v. Granville,

530 U.S. 57, 65, 120 S. Ct. 2054, 2060, 147 L. Ed. 2d 49 (2000) (internal quotation marks omitted).

"[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest

of the fundamental liberty interests recognized by [the courts]."  Id., 120 S. Ct. at 2060.

This right is not, however, an unqualified one.  Blau v. Fort Thomas Publ. Sch. Dist., 401

F.3d 381, 395 (6th Cir. 2005).  As the Sixth Circuit articulated in Blau,

> [t]he critical point is this:  While parents may have a fundamental right to decide
> *whether* to send their child to a public school, they do not have a fundamental right
> generally to direct *how* a public school teaches their child.  Whether it is the school
> curriculum, the hours of the school day, *school discipline*, the timing and content of
> examinations, the individuals hired to teach at the school, the extracurricular
> activities offered at the school or . . . a dress code, these issues of public education
> are generally committed to the control of state and local authorities.

Id. at 395-96 (some emphasis supplied) (internal quotation marks omitted).  Government actions

infringing on fundamental rights receive strict scrutiny.  Id. at 393.  In the absence of a fundamental

right, a plaintiff must show that the challenged school action was not "rationally related to a

22

legitimate state interest." Id.  Mrs. Nixon has made no effort whatever to make such a showing.  Her Fourteenth Amendment claim, therefore, is DISMISSED.

### Eighth Amendment

The Plaintiff alleges that Defendants violated the Eighth Amendment by failing to conduct an investigation or interviews with respect to the tweeting incident, to listen to A.N.'s side of the story, or to properly claim responsibility for making the decision to send her to alternative school. The Eighth Amendment, which prohibits the imposition of cruel and unusual punishment, is inapplicable to a school's disciplinary punishment of students.  Ingraham v. Wright, 430 U.S. 651, 664, 97 S. Ct.  1401, 1408-09, 51 L. Ed. 2d 711 (1977); Moss v. Shelby Cnty., 401 F. Supp. 2d 850, 854 (W.D. Tenn. 2005).  The United States Supreme Court noted in Ingraham that "[a]n examination of the history of the [Eighth] Amendment and the decisions of [the Supreme] Court construing the proscription against cruel and unusual punishment confirms that it was designed to protect those convicted of crimes."[16]  Ingraham, 430 U.S. at 664, 97 S. Ct. at 1408-09.  The Eighth Amendment claim is, therefore, DISMISSED.

### *Municipal/Supervisor Liability*

The parties have presented arguments concerning whether summary judgment should be granted on a federal § 1983 claim by the Plaintiff for the negligent hiring, training, supervision and retention of Stricklin.[17]  It is somewhat unclear to the Court whether this claim, presented in count

---

[16]Tellingly, perhaps, the Plaintiff has offered no caselaw in support of her claim in responding to the motion for summary judgment.

[17]In her responsive brief, the Plaintiff avers in the same § 1983 municipal liability argument that liability should be imposed based on a failure to lawfully manage the alternative school.  However, the count in the complaint in which negligent hiring, training, supervision and retention were alleged made no mention whatever of the alternative school.  Indeed, the only part of the complaint in which allegations concerning management of the alternative school appeared had to do with purely state law claims.  Plaintiff has made no motion to amend her complaint to

VIII of the complaint, was in fact intended to be a federal claim, a state claim, or both.  In any case, because the parties are apparently treating it as a federal claim, the Court will address their assertions in that regard.

Count VIII's allegations are directed toward Hardin County and Haffly.[18]  In order to establish a claim of supervisor liability, a plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." Salyers v. City of Portsmouth, ___ F. App'x ___, 2013 WL 4436536, at *5 (6th Cir. 2013) (quoting McQueen v. Beecher Cmty. Schs., 433 F.3d 460, 470 (6th Cir. 2006)).  To hold Hardin County liable, Plaintiff "must demonstrate that the alleged federal violation occurred because of a municipal policy or custom." Burgess v. Fischer, 735 F.3d 462, 478  (6th Cir. 2013) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)), *reh'g & reh'g en banc denied* (Dec. 19, 2013).  "For both, a prerequisite to liability is that a constitutional violation has occurred." Salyers, 2013 WL 4436536, at *5 (internal alterations & quotation marks omitted).


In this case, the Plaintiff in her responsive brief identifies the constitutional violation supporting her municipal/supervisor liability claim as that alleged under the Fourteenth Amendment. Based on the Court's dismissal of the Fourteenth Amendment claim, the negligent hiring, training, supervision and retention claim, to the extent it is grounded in federal law, must also fail.  *See* id. (because the defendant committed no constitutional violation, plaintiff's supervisor and municipal

---

include allegations of wrongful acts relative to the management of the alternative school under federal law.  Accordingly, the Court will not consider Plaintiff's assertions as to this nonexistent claim.

[18]This allegation was also made against Defendant Thomas.

24

liability claims based on that violation were without merit).

State Law Claims.

The Defendants also seek dismissal of the Plaintiff's state law claims.  The Tennessee Governmental Tort Liability Act ("GTLA") governs state law claims against governmental entities and their employees.  *See* Tenn. Code Ann. § 29-20-101, *et seq*.  GTLA claims would ordinarily confer supplemental jurisdiction in this Court because they arise out of the same facts and form part of the same case or controversy.  *See* 28 U.S.C. § 1367(a).  However, these allegations must be brought in "strict compliance" with the terms of the state statute.  *See* Tenn. Code Ann. § 29-20-201(c).  The GTLA expressly states that Tennessee "circuit courts shall have exclusive original jurisdiction" over claims brought pursuant to its provisions.  Tenn. Code Ann. § 29-20-307.

A district court may, in its discretion, decline supplemental jurisdiction over a state law claim even if jurisdiction would otherwise be proper under § 1367(a).  Section 1367(c)(4) allows a district court to "decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(c)(4).  The Sixth Circuit has held that "the Tennessee legislature expressed a clear preference that [GTLA] claims be handled by its own state courts.  This unequivocal preference of the Tennessee legislature is an exceptional circumstance [under § 1367(c)(4) ] for declining jurisdiction."  Gregory v. Shelby Cnty., Tenn., 220 F.3d 433, 446 (6th Cir.2000).  Therefore, this Court declines to exercise supplemental jurisdiction over Plaintiff's GTLA claims.  *See* Ables v. Shelby Cnty., Tenn., No. 2:10-CV-02169-JPM-dkv, 2010 WL 3024959, at *5 (W.D. Tenn. July 29, 2010) (state law claims dismissed in light of Sixth Circuit's finding that Tennessee legislature's preference that GTLA claims be addressed in state courts was an exceptional circumstance under

§ 1327(c)(4) supporting order declining jurisdiction).   The claims are DISMISSED without prejudice.[19]

*CONCLUSION*

For the reasons set forth herein, all claims against Defendant Thomas are DISMISSED, as are the official capacity claims against Defendants Haffly and Stricklin.  Otherwise, the motion for summary judgment is DENIED as to the Plaintiff's First Amendment claims and GRANTED on the remaining claims.

IT IS SO ORDERED this 27th day of December 2013.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE

---

[19]In light of the Court's dismissal of Plaintiff's state law claims on exclusivity grounds, it need not address the parties' assertions with respect to the merits of those claims.

26